1  **WO**                                                                    HJ

2

3

4

5

6                 IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9   Karen E. Rose,                      )  No. CV 06-1885-PHX-EHC
                                        )
10           Plaintiff,                 )  **ORDER**
                                        )
11  vs.                                 )
                                        )
12                                      )
    Michael J. Astrue, Commissioner of Social )
13  Security Administration,            )
                                        )
14           Defendant.                 )
                                        )
15  _____ )

16

17        This is a proceeding to review a final decision of the Defendant Social Security

18  Commissioner ("Commissioner") denying disability benefits to Plaintiff Karen E. Rose. The

19  parties filed a cross-motions for summary judgment (Dkts. 26, 32), which are fully briefed.

20  **I.    Background**

21        Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB")

22  under Title II of the Social Security Act on March 11, 2003, alleging disability due to a right

23  knee problems, back pain, stomach problems, varicose veins, Achilles tendinitis, and heel

24  spurs. (Tr. 25, 30, 76, 84, 108, 119). Plaintiff originally alleged a disability onset date of

25  March 8, 2001, which was subsequently amended to June 1, 2001. (Tr. 24). Plaintiff's DIB

26  application was denied initially and upon reconsideration, and a request for hearing was

27  timely filed. (Tr. 24). The ALJ held a hearing on March 23, 2005. (Tr. 24). Plaintiff

28  appeared at the hearing represented by counsel. (Tr. 24). Plaintiff testified, as did vocational

expert Linda Heiland. (Tr. 24). The ALJ denied Plaintiff's application in a decision dated May 23, 2005. (Tr. 24-30). The Appeals Council denied Plaintiff's request for review. (Tr. 8). Plaintiff now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

## II.    Evidence in the Record

At the time of her alleged onset date, Plaintiff was 57 years old. (Tr. 25). Plaintiff completed two years of college in 1977 and her past work includes employment as an applications specialist and as a legal assistant. (Tr. 25, 63, 77-78, 81, 85-86).

### A.    Early Medical History[1]

On August 12, 1988, Dr. Lester E. Mertz, M.D. examined Plaintiff and diagnosed esophageal motility abnormality and elevated antinuclear antibody–possible early Scleroderma, history of ulcerative procritis, and moderate obesity. (Tr. 404-406).

On January 30, 1992, Dr. Bernard Shostack, M.D. noted that Plaintiff had been his patient for a number of years and was last seen on December 3, 1991, for pain in her right leg. (Tr. 364). Dr. Shostack recommended therapy for treatment of facet joint disease and sciatica. (Tr. 364). Plaintiff was improved on January 30, 1992, (Tr. 364) and after another several weeks of physical therapy, Plaintiff reported that she was improved enough to continue with the exercises at home on March 10, 1992. (Tr. 363).

On May 11, 1992, Plaintiff saw Dr. Gregory S. Johnston, M.D. for her back pain, which she reported had been present since August of 1991. (Tr. 400). Plaintiff could not recall any overt injury but noticed increased back pain and pain in the right leg, which were aggravated by driving and sitting for extended periods of time. (Tr. 400). Dr. Johnston noted that physical therapy had been helpful and that Plaintiff reported she was 90% better until just a few weeks prior to her visit when she began using less of the nonsteriodal anti-

---

[1]The administrative record contains medical evidence going back as far as the 1980s, which is not fully discussed herein. Plaintiff's Statement of Facts in support of her motion for summary judgment summarizes much of this evidence, and thus, the Court only summarizes the key facts herein. In ruling on the pending motions, the Court has, however, considered all the evidence in the record.

inflammatory Lodine.  (Tr. 400).  The physical examination was positive for the right shoulder being slightly more elevated than the left, flattening through the thoracic spine, very mild scoliosis in the lumbosacral region convexed to the right, tenderness to deep palpation in the right low back and upper sciatic notch region on the right side, and contralateral right low back discomfort caused by lateral bending to the left at near full range.  (Tr. 400-401). Dr. Johnston's review of X-Rays taken March 10, 1992, revealed slight scoliosis convexed to the left side, narrowing at L4-5 and L5-S1 (AP view), minimal vertebral lipping at L3 and L2, minimal narrowing at L4-5, bony encroachment of the formina at L4-5, and mild facet degenerative changes.    (Tr. 401).    Dr. Johnston diagnosed scoliosis and lubosacral strain/sprain, and suggested ruling out HNP (herniated nucleus pulposus).    (Tr. 402; Plaintiff's Statement of Facts ("PSOF") ¶ 21).  Dr. Johnston found no need for surgery or an MRI and instructed Plaintiff on exercises that she could do at home along with her other exercises.  (Tr. 402).  At the request of Dr. Johnston, a lumbar spine MRI was taken on August 28, 1992, and revealed a small central disc herniation at L4-L5 combined with bilateral ligamentum flavum hypertrophy and resulting in moderate lumbar canal stenosis. (Tr. 236-237).

On July 20, 1994, Dr. Shostack noted that Plaintiff had been complaining of hip pain while lying down or sitting, pain in her right knee, and had an accident in March 1994.  (Tr. 358).  Dr. Shostack diagnosed a left hip strain and possible chondromalacia of the right knee. (Tr. 358).  Dr. Shostack observed that Plaintiff had gained a lot of weight and recommended Plaintiff lose some weight to see if the situation would improve.  (Tr. 358).

On December 15, 1994, Dr. Charles C. Hopmans, M.D. performed an orthopedic evaluation of Plaintiff related to her complaints of discomfort in her right low back region to her buttock down to the knee region.  (Tr. 393).  Dr. Hopmans noted that Plaintiff's right low back region and buttock pain is not constant and that Plaintiff usually had the pain when sitting, especially in her car, but walking was not a major problem for her.  (Tr. 393).  Dr. Hopmans also noted that Plaintiff was employed as an applications specialist at Best Western International, a desk job, and that Plaintiff "state[d] that she is up and down a lot at work."

1   (Tr. 394).  Dr. Hopmans observed that Plaintiff presented with fairly marked varicosities
2   involving the medial and anteromedial aspect of her left leg from the knee distally.  (Tr. 396).
3   Dr. Hopmans concluded that Plaintiff was significantly deconditioned and should go back
4   on her exercise routine.  (Tr. 396-97).

5       Dr. Hopmans saw Plaintiff again on March 2, 1995, who complained of increasing
6   back discomfort associated with several unusual episodes including moving from one place
7   to another with respect to her work routine.  (Tr. 392).  Dr. Hopmans noted that Plaintiff's
8   discomfort was primarily in her back and not in her legs at that time.  (Tr. 392).  Dr.
9   Hopmans took X-Rays of her lumber spine, which demonstrated good disc spacing and no
10  major changes.  (Tr. 392).  Dr. Hopmans noted that Plaintiff did not have anything more than
11  a variable degree of mechanical disability.  (Tr. 392).  He advised Plaintiff to continue with
12  her Relafen and an active therapy routine, noting that he did "not know what else [they
13  could] do to improve this situation."  (Tr. 392).

14      On May 15, 1996, a lumbar spine MRI revealed mild facet degenerative changes at
15  L5-S1, broad-based central disc herniation eccentric to the left and facet and ligamentous
16  changes at L4-5 resulting in moderate central canal stenosis, an increase in the size of the
17  disc herniation since the prior August 28, 1992, exam, small fragment of disc material in the
18  lateral recess at the L4 pedicle level on the left appearing to originate from the L3-L4 disc
19  level on the sagittal images.  (Tr. 235).

20      On May 28, 1996, Dr. Terry E. McLean, M.D. examined Plaintiff for her complaints
21  of left low back pain, left lower extremity radicular pain secondary to lumbar spinal stenosis,
22  and the disc herniations confirmed by MRI scan.  (Tr. 389).  Dr. McLean reported that
23  aggravating factors included sitting, bending, lifting, straining, or standing.  (Tr. 389).
24  Plaintiff could walk about one-half block, could not find a comfortable position sitting, and
25  had tried working part-time and even full-time but both had aggravated her symptoms.  (Tr.
26  389).  Dr. McLean diagnosed lumbar spinal stenosis with disc herniation L4-5 with left L5
27  radiculopathy, and extruded lumbar disc herniation L3-L4 with left L4 radiculopathy.  (Tr.
28  390).  Dr. McClean discussed Plaintiff's options, which included activity modification,

1   working part-time with frequent change of position, trial of lumbar epidural steroid

2   injections, and continuing with her Volataren and her pain medications as needed.  (Tr. 390).

3   Dr. McClean noted that if Plaintiff failed to improve over the next two weeks he would

4   recommend surgery.  (Tr. 390).

5       Dr. McClean's notes from May until August 1996 detail Plaintiffs treatment.  (Tr.

6   386-388).  Plaintiff received epidural lumbar injections on June 20, 1996, and during that

7   visit to Dr. McClean denied any right lower extremity pain.  (Tr. 388).  Dr. McClean noted

8   that her exam showed no acute distress, she walked without a limp, had some hamstring

9   pulling on the left and residual numbness on the left leg.  (Tr. 388).  Dr. McClean noted that

10  Plaintiff had progressed overall.  (Tr. 388).  He instituted formalized physical therapy two

11  times a week for three weeks, recommended that Plaintiff continue resume working full-time

12  with necessity for frequent change of position.  (Tr. 388).  Dr. McClean observed gradual

13  improvement in subsequent visits and continued giving Plaintiff epidurals.  (Tr. 387-388).

14  On August 16, 1996, Dr. McClean reported that Plaintiff is for the most part pain-free,

15  though she had some residual weakness that she may always have.  (Tr. 387).

16      On September 9, 1996, Dr. James A. Singer, M.D. evaluated Plaintiff for complaints

17  of blood and mucus in her bowel movements.  (Tr. 378).  A Physical examination was

18  unremarkable, and Dr. Singer opined that Plaintiff possible had irritable bowel syndrome or

19  procritis, although procritis was never actually documented in Plaintiff and the classic

20  symptoms were not present.  (Tr. 379).

21      On June 16, 1997, Dr. Shostack reported that Plaintiff had been experiencing back

22  pain for several days and was on bed rest.  (Tr. 349).  He noted that Plaintiff had never

23  obtained a third steriod injection the prior year as part of her prescribed series.  (Tr. 349).

24  Dr. Shostack prescribed steroid injections again.  (Tr. 349).

25      On November 11, 1997, Dr. Niranjan S. Chawla, M.D. examined Plaintiff for her

26  complaints of low back pain, which had flared up in the preceding weeks.  (Tr. 375).  A

27  physical exam showed, *inter alia*, that Plaintiff walked symmetrically without any antalgia

28  but experienced back discomfort when walking on her heels, rising up from a bend,

extending backward and to the left, lateral bending to the left, bringing the knee toward the shoulder, trunk rotation, and when lifting the left leg in a prone position.  (Tr. 376).  Dr. Chawla opined that Plaintiff's symptoms were a combination of lumbar spondylosis, degenerative disc disease, anthropathy, obesity and strain on the gluteal muscles because of her body size. (Tr. 376).  He recommended continuation of Plaintiff's current medications of Vicodin and Parafon Forte, physical therapy, and tender point injections on an as-needed basis.  (Tr. 377).

On June 16, 1998, Dr. Shostack reported Plaintiff's complaints of pain in both knees, worse on the right, and back problems.  (Tr. 346).  Dr. Shostack X-Rayed both knees and observed that the left knee seemed okay, but the right had some advanced signs of early osteoarthritis.  (Tr. 346).  Dr. Shostack started Plaintiff on Ace bandage, heat, and Aleve and cautioned Plaintiff about climbing stairs or jogging.  (Tr. 346).

On January 14, 1999, Dr. Shostack examined Plaintiff for complaints of a sore on her right leg.  (Tr. 341).  He observed severe varicose veins and advised Plaintiff to continue using her elastic stockings.  (Tr. 341).

On March 24, 1999, Dr. Shostack examined Plaintiff for complaints of pain her right knee caused by walking, particularly on stairs.  (Tr. 340).  Dr. Shostack opined that Plaintiff had osteoarthritis in the right knee.  (Tr. 340).  Dr. Shostack noted that Plaintiff was given a leave of absence from work starting on that date.  (Tr. 340).

On June 8, 1999, Dr. Shostack examined Plaintiff for complaints of a pinched nerve in her neck, radiating intermittently down her left arm and down to the elbow, and right knee pain. (Tr. 339).  Dr. Shostack noted possible cervical spine neuropathy. (Tr. 339).  Plaintiff expressed a desire for physical therapy.  (Tr. 339).

On May 1, 2000, Dr. Shostack conducted a complete physical examination. (Tr. 129-131, 134).  Plaintiff complained of fatigue, headaches, low back pain, and pain in her right knee, varicose veins with pain around the right Achilles tendon, and hemorrhoid problems. (Tr. 129).  The physical examination was unremarkable except for tenderness in the right Achilles and right ankle, although Plaintiff had a full range of motion throughout.  (Tr. 130).

No abnormalities were seen in the right ankle X-Ray. (Tr. 134). Dr. Shostack diagnosed spinal chord stenosis, fatigue, recurrent headaches, allergic rhinitis, severe varicose veins, tendinitis of the right Achilles tendon, hemorrhoids, and osteoarthritis. (Tr. 130-131).

On March 12, 2001, Dr. Shostack reported that on March 8, 2001, Plaintiff was walking through a parking lot and fell on her hands, her right breast, and both knees, and hurt her back, right shoulder, and right knee. (Tr. 126). A physical examination revealed that Plaintiff was very tender in her right knee particularly medially and over the patella, her left knee had limited range of motion, and she had tenderness over the shoulder region. (Tr. 126). X-Rays taken on March 12, 2001, showed mild degenerative change in the lateral compartment of the right knee, with no significant abnormalities on the left. (Tr. 277).

On March 20, 2001, Dr. Shostack examined Plaintiff for back pain that was worse in the mornings, difficulty walking, knee pain, sinus headaches, varicose veins, swelling of the right foot, and a sore right shoulder. (Tr. 124). A physical examination found Plaintiff's range of motion in her right shoulder was restricted, range of motion in the knees caused pain, and Plaintiff had varicose veins in the left leg. (Tr. 124). Dr. Shostack diagnosed spinal chord stenosis, tendinitis of the shoulder, osteoarthritis, varicose veins, and allergic rhinitis. (Tr. 125).

**B.    Mark A. Greenfield, D.O.**

On April 9, 2001, Dr. Mark A. Greenfield, D.O., examined Plaintiff's right knee and right shoulder injuries incurred when Plaintiff fell on all fours in a parking lot on March 8, 2001. (Tr. 199). Physical examination of the knee and shoulder were both unremarkable. (Tr. 200). Dr. Greenfield reviewed X-Rays of the Plaintiff's knees taken March 12, 2001, and noted some mild degenerative changes affecting primarily the lateral compartment of the right knee and a normal left knee. (Tr. 200). Dr. Greenfield diagnosed contusion to the right knee and a sprain to the right shoulder that was "resolved". (Tr. 200). Dr. Greenfield recommended physical therapy for Plaintiff's right knee problems, noted that her right shoulder symptoms were resolved, and placed Plaintiff on full work status. (Tr. 201, 216).

1    On April 30, 2001, Dr. Greenfield saw Plaintiff for a follow-up evaluation and
2 reported that Plaintiff felt the physical therapy was helping her somewhat, although she still
3 had symptoms and wished to continue with the physical therapy.  (Tr. 198).

4    On May 21, 2001, Dr. Greenfield saw Plaintiff for a follow-up evaluation and noted
5 that her right knee symptoms were improving with the physical therapy.  (Tr. 197).  Plaintiff
6 reported some swelling above the knee.  (Tr. 197).  A physical examination showed no
7 appreciable joint effusion.  (Tr. 197).  Plaintiff reported that she also injured both of her
8 hands at the time of the initial injury and that they were 90% improved.  (Tr. 197).  Physical
9 examination of Plaintiff's hands was unremarkable.  (Tr. 197).  Dr. Greenfield placed
10 Plaintiff on full work status and recommended only symptomatic treatment for Plaintiff's
11 hand pain.  (Tr. 197, 215).

12    On June 18, 2001, Dr. Greenfield examined Plaintiff for follow-up regarding her right
13 knee and right shoulder.  (Tr. 196).  Dr. Greenfield reported that Plaintiff's knee did not
14 "bother her every day, but she still does get some discomfort and she still notices some
15 swelling."  (Tr. 196).  Plaintiff felt she had reached a plateau with the physical therapy and,
16 thus, Dr. Greenfield noted that he would hold off on additional therapy at that time."  (Tr.
17 196).  Dr. Greenfield noted that if Plaintiff continued to improve, "then it is felt she will be
18 stationary."  (Tr. 196).  Dr. Greenfield placed Plaintiff on full work duty.  (Tr. 196, 214).

19    On August 13, 2001, Dr. Greenfield examined Plaintiff for follow-up regarding her
20 right knee and right shoulder.  (Tr. 195).  Dr. Greenfield reported that Plaintiff felt about the
21 same since her prior evaluation on June 18, 2001, and that she was not bothered all the time
22 or everyday.  (Tr. 195).  Dr. Greenfield felt Plaintiff was describing more of a suprapatellar
23 type of swelling.  (Tr. 195).  A physical examination showed no suprapatellar effusion.  (Tr.
24 195).  Dr. Greenfield recommended obtaining an MRI for completeness.  (Tr. 195).  Dr.
25 Greenfield placed Plaintiff on full work duty.  (Tr. 195, 213).

26    On August 20, 2001, an MRI revealed a torn medial meniscus and a possible tear in
27 the anterior horn of the lateral meniscus.  (Tr. 281).

28

1          On September 24, 2001, Dr. Greenfield examined Plaintiff for follow-up regarding
2     her right knee. (Tr. 194). Dr. Greenfield reported that Plaintiff felt about the same since her
3     last evaluation and still described her discomfort primarily suprapatellar and laterally.  (Tr.
4     194). Dr. Greenfield reviewed the MRI, and noted a tear of the medial meniscus and possible
5     tear of the anterior horn of the lateral meniscus.  (Tr. 194).  Dr. Greenfield noted that
6     clinically Plaintiff really didn't describe the pain medially and on examination she really
7     didn't have tenderness along the medial joint line. (Tr. 194). Dr. Greenfield opined that the
8     consistent effusion may have been the result of underlying meniscal pathology.  (Tr. 194).
9     Dr. Greenfield applied a cortisone injection and placed Plaintiff on full work status. (Tr. 194,
10    212)**.**

11         On October 15, 2001, Dr. Greenfield examined Plaintiff for follow-up regarding her
12    right knee. (Tr. 193).  Dr. Greenfield reported that Plaintiff didn't feel the injection made
13    much of a difference for her.  (Tr. 193).  Dr. Greenfield advised Plaintiff that he had no
14    further conservative treatment for her and consideration of arthroscopy could be given to
15    treat the underlying meniscal pathology. (Tr. 193). Dr. Greenfield advised that there would
16    be no guarantees that arthroscopy would eliminate her symptoms and noted that if Plaintiff
17    did not want to follow through with arthroscopy he felt "she will be stationary." (Tr. 193).
18    Dr. Greenfield placed Plaintiff on full work status.  (Tr. 193, 211).

19         On November 15, 2001, Dr. Greenfield examined Plaintiff for follow-up regarding
20    her right knee. (Tr. 192). Dr. Greenfield reported that Plaintiff felt she had improved over
21    time but still had a level of discomfort in her right knee that didn't bother her with certain
22    activities.  (Tr. 192).  Dr. Greenfield reported that Plaintiff described the discomfort
23    suprapatellar as well as laterally, and that overall she felt she had reached a plateau.  (Tr.
24    192). Plaintiff felt better than in the past but still felt some ongoing symptoms to her right
25    knee. (Tr. 192).  Dr. Greenfield discussed with Plaintiff either declaring her stationary or
26    trying further treatment. (Tr. 192).  Plaintiff requested arthroscopic surgery. (Tr. 192). Dr.
27    Greenfield provided no guarantees that the surgery would partially or completely eliminate
28    her symptoms. (Tr. 192). Dr. Greenfield placed Plaintiff on full work duty.  (Tr. 210).

1    On February 15, 2002, Dr. Greenfield performed arthroscopic surgery, which
2 confirmed the tear in medial meniscus, tear in lateral meniscus, and also revealed grade three
3 chondromalacia medial femoral condyle, grade three chondromalacia lateral femoral condyle,
4 grade four chondromalacia lateral tibial plateau, and grade three chondromalacia patella. (Tr.
5 150).

6    On February 21, 2002, Dr. Greenfield examined Plaintiff one week after her surgery
7 and noted generalized discomfort in her calf bilaterally (felt to be muscular), which felt better
8 when Plaintiff rubbed it. (Tr. 191). Dr. Greenfield referred Plaintiff for some physical
9 therapy and placed her on non-work status. (Tr. 191, 209).

10    On February 28, 2002, Dr. Greenfield noted that Plaintiff was making progress, had
11 good motion, and no calf pain or tenderness. (Tr. 190). Dr. Greenfield released her to light
12 duty status of seated work only. (Tr. 190, 208).

13    On March 21, 2002, Dr. Greenfield noted that therapy was helping Plaintiff and that
14 she was making progress. (Tr. 189). Dr. Greenfield reported that Plaintiff felt she could do
15 an independent therapy program. (Tr. 189). A physical examination showed some mild
16 swelling, good motion, and no calf pain or tenderness. (Tr. 189). Dr. Greenfield placed her
17 on light duty status of no kneeling, squatting or climbing, standing and walking as tolerated.
18 (Tr. 189, 207). Dr. Greenfield planned to see Plaintiff back in three weeks and assess
19 whether she was stationary at that time. (Tr. 189).

20    On April 11, 2002, Dr. Greenfield reported that Plaintiff indicated she still had some
21 swelling in her knee. (Tr. 188). Dr. Greenfield reported some discomfort both medially and
22 laterally. (Tr. 188). A physical examination showed some swelling. (Tr. 188). Dr.
23 Greenfield prescribed anti-inflammatory medication and noted that Plaintiff had only
24 followed through with one visit of physical therapy. (Tr. 188). Dr. Greenfield placed
25 Plaintiff on light duty status of no kneeling, squatting or climbing, standing and walking as
26 tolerated. (Tr. 188, 206).

27    On May 6, 2001, Dr. Greenfield reported that physical therapy was helping Plaintiff
28 and that recently she had been experiencing some increased discomfort that she felt may have

1    been related to the therapy. (Tr. 187). A physical examination showed that Plaintiff still had

2    effusion, although less than previously. (Tr. 187). There was no calf pain or tenderness.

3    (Tr. 187). Dr. Greenfield placed Plaintiff on light duty status with no climbing, standing and

4    walking as tolerated. (Tr. 187, 205).

5        On June 3, 2001, Dr. Greenfield reported that Plaintiff was having good days and bad

6    days and that she felt the Bextra was helping. (Tr. 186). A physical examination showed

7    joint effusion. (Tr. 186). Dr. Greenfield performed an aspiration of fluid from the right

8    kneed joint, obtaining thirty-five cc's of fluid, and then injected the right knee joint with

9    coricosteriod. (Tr. 186). Dr. Greenfield reported that Plaintiff tolerated this treatment well

10   and placed her on light duty status with no climbing, standing and walking as tolerated. (Tr.

11   186, 204).

12       On July 1, 2002, Dr. Greenfield reported that Plaintiff felt improvement and had much

13   less swelling. (Tr. 185). Dr. Greenfield reported that Plaintiff did not have any discomfort

14   medially but that she had started to notice some discomfort laterally. (Tr. 185). A physical

15   examination showed minimal effusion. (Tr. 185). Dr. Greenfield reported that Plaintiff felt

16   her motion had improved and there was no calf pain or tenderness. (Tr. 185). Dr. Greenfield

17   opined that Plaintiff was stationary as it relates to the injury, but explained to Plaintiff that

18   she had some preexisting degenerative arthritis. (Tr. 185). Dr. Greenfield noted that for

19   "further treatment regarding that she can be evaluated under her private health insurance."

20   (Tr. 185). Dr. Greenfield assessed Plaintiff at a permanent impairment rating of 10% lower

21   extremity based upon the American Medical Association Guides to the Evaluation of

22   Permanent Impairment. (Tr. 185).

23       On November 14, 2002, Dr. Greenfield evaluated Plaintiff's right knee and noted that

24   she felt she was a little better. (Tr. 184). Dr. Greenfield reported that Plaintiff had been

25   walking, and her ease of walking had improved, although she had noticed some discomfort

26   in her right hip area and into the lateral aspect of her right foot. (Tr. 184). Plaintiff declined

27   an injection since she had been feeling better over the previous few days. (Tr. 184). A

28

1  physical examination showed mild effusion.  (Tr. 184).  Dr. Greenfield placed Plaintiff on
2  full work status.  (Tr. 184).

3      **C.      Lucia McPhee, M.D.**

4          On September 15, 2003, Dr. Lucia McPhee, M.D., a physical medicine and
5  rehabilitation specialist, examined Plaintiff at the request of the Arizona Department of
6  Economic Security, Disability Determination Services (DDS) (Tr. 222-226).  A physical
7  examination found Plaintiff's gait within normal limits.  (Tr. 223).  Plaintiff could only
8  crouch a third of the way to the ground at most, holding on to furniture for support, and
9  complaining of pain in the knees.  (Tr. 223).  Plaintiff's back range of motion was mildly
10 reduced in all planes, and on palpatation there was tenderness along the lumbar paraspinal
11 muscles and also at the midthroacic paraspinal muscles.  (Tr. 223).  There was mild
12 tenderness at the greater trochanteric regions bilaterally.  (Tr. 223).  On her upper
13 extremities, Plaintiff complained of pain in the right shoulder region with full shoulder
14 abduction. (Tr. 223).  Plaintiff had full strength of the rotator cuff muscles, although there
15 was pain with testing of the right supraspinatus muscle, and Hawkins was positive on the
16 right. (Tr. 223-224). On examination of Plaintiff's lower extremities, extensive varicosities
17 were noted in the right lower extremity, though Plaintiff did not have her usual compressive
18 stockings on that day.  (Tr. 224).  No effusion was found in the knees, though there was
19 tenderness in the right knee along the medial joint line.  (Tr. 224).  There was no significant
20 lateral joint line tenderness, but was peripatellar tenderness.  (Tr. 224).  There was no
21 significant medial lateral instability anterior drawer testing was negative.  (Tr. 224).

22         Dr. McPhee diagnosed chronic low back pain, extensive varicose veins in the right
23 lower extremity, bilateral knee pain with history of grade III chondromalacia right knee
24 based on arthroscopic surgery report, history of a tear of the lateral meniscus of the left knee,
25 overweight, and right supraspinal tendinitis.  (Tr. 224).  Dr. McPhee limited Plaintiff to
26 lifting 20 pounds occasionally, 10 pounds frequently, standing/walking at least two hours in
27 an eight hour workday with no need for an assistive device, sitting six hours per workday
28 (sitting one hour at a time followed by a brief change in position), standing/walking less than

1    six hours per workday due to complaints of bilateral knee pain and underlying degeneration

2    and meniscal tear, climbing and stooping limited to occasional, and crouching limited to a

3    partial crouch with support available.  (Tr. 224).  Plaintiff was to avoid repetitive reaching

4    overhead with the right upper extremity.  (Tr. 224).  Dr. McPhee made no findings that

5    would restrict gross handling or fine manipulation.  (Tr. 224-226).

6        **D.    Shari Gibson, M.D.**[2]

7        Dr. Shari L. Gibson, M.D. treated Plaintiff for various conditions not related to her

8    disability claim. On April 27, 2001, Plaintiff saw complaining of dizziness and vertigo. (Tr.

9    261). Dr. Gibson's handwritten notes reference the March 8, 2001, fall.  On May 7, 2001,

10   Dr. Gibson treated Plaintiff for a large skin tag. (Tr. 260).  On August 20, 2001, Dr. Gibson

11   treated Plaintiff for sore throat. (Tr. 259).  On October 24, 2001, Dr. Gibson treated Plaintiff

12   for sinus problems.  (Tr. 258).  On December 17, 2002, Dr. Gibson  treated Plaintiff for

13   bronchitis and asthma. (Tr. 257).  On January 3, 2003, Dr. Gibson treated Plaintiff again for

14   bronchitis. (Tr. 256).

15       On April 1, 2003, Dr. Gibson reported that Plaintiff complained of four left knee

16   injuries in the preceding five months: a nonspecific fall, a re-injury to the left knee by a

17   puppy, an incident where Plaintiff tripped over shoes, and a nonspecific twisting incident.

18   (Tr. 255).  A left knee X-Ray ordered by Dr. Gibson on April 4, 2003, was negative except

19   for mild osteoarthritic changes. (Tr. 274).  An MRI of the left knee ordered by Dr. Gibson

20   on April 18, 2003, showed the cruciate ligaments intact, knee effusion with popliteal cyst,

21   and a tear of the anterior horn and body of the lateral meniscus extending to the superior

22   surface. (Tr. 270).

23       On May 13, 2003, Dr. Douglas B. Freedberg, M.D. evaluated Plaintiff's left knee at

24   the request of Dr. Gibson. (Tr. 220).  A physical examination showed that Plaintiff walked

25   with a slight antalgic gait, the left knee showed trace effusion, peripatellar discomfort, and

26

27       [2]These handwritten notes are largely illegible and the Court only lists those treatments

28   that it can readily discern were recorded.

1    no discreet joint line tenderness.  (Tr. 221).  Dr. Freedberg diagnosed a possible lateral

2    meniscal tear in an overweight female.  (Tr. 221).  He injected the knee with Lidocaine and

3    dexamenthasone, recommended strengthening and weight loss, and suggested considering

4    arthroscopy if Plaintiff remained significantly symptomatic.  (Tr. 221).  On June 10, 2003,

5    Dr. Freedberg administered another injection of Lidocaine and dexamethasone.  (Tr. 219).

6    On July 22, 2003, Dr. Freedberg evaluated Plaintiff who reported that the injection helped

7    tremendously for two or so weeks and that she feels at least 50% better after doing physical

8    therapy.  (Tr. 218).  Dr. Freedberg also reviewed the operative note from Plaintiff's right

9    knee surgery and noted that Plaintiff said she was worse after the surgery and is not anxious

10   to have another surgery on her left knee.  (Tr. 218).

11         On August 26, 2003, Plaintiff was examined in the emergency department of

12   Scottsdale Healthcare with a chief complaint of right inner thigh pain.  (Tr. 229).  A physical

13   examination showed that Plaintiff's bilateral lower extremities had a profound amount of

14   varicose veins superficial on the lower portion of her legs and a palpable varicose vein on her

15   right inner thigh in the exact area where her pain was.  (Tr. 230).  Ultrasound was negative

16   for deep venous thrombosis but there was some evidence of a superficial phlebitis.  (Tr. 230).

17   The diagnoses were phlebitis and myalgias.  (Tr. 230).  Plaintiff was discharged in good

18   condition with instructions for superficial phlebitis and myalgia.  (Tr. 233).

19         On August 28, 2003, Dr. Jack E. Cook, M.D., an associate of Dr. Gibson, diagnosed

20   superficial thrombophlebitis of the right thigh, and saphenous varicosities of the right leg and

21   thigh. (Dkt. 13).  Dr. Cook advised Plaintiff that she could increase her activities.  (Tr. 253).

22         An esophagogastroduodenoscopy on September 17, 2003, showed that the duodendum

23   was unremarkable with mild erythema around the pylorus, a diminishment of the lower

24   esophageal sphincter tone and a minor hiatus hernia.  (Tr. 227).  Diagnoses were acute and

25   chronic reflux tendency and mild gastritis.  (Tr. 227).

26         On September 18, 2003, Dr. Gibson examined Plaintiff for superficial

27   thrombophlebitis of the right thigh.  (Tr. 252).  Treatment notes are illegible.  (Tr. 252).

28

1    On April 21, 2004, Dr. Gibson reported right hip/buttock pain and a cervical muscle strain.

2    (Tr. 305).   On October 5, 2004, Dr. Gibson reported right hand pain.  (Tr. 302).   On

3    November 2, 2004, Dr. Gibson reported a right trapezius strain with a right upper extremity

4    radiculopathy.  (Tr. 301)  The treatment notes from these visits are largely illegible to the

5    Court.

6            In November and December of 2004, Dr. Gibson sent Plaintiff to physical therapy.

7    (Tr. 313-332).  The stated goals of the physical therapy were that Plaintiff be independent

8    with home exercise program, have 25% improvement in cervical range of motion with

9    manageable pain for activities of daily living, and have normal upper extremity and cervical

10   thoracic stabilization strength for improved tolerance to sitting, driving and lifting. (Tr. 329).

11   On March 16, 2005, a Discharge Summary indicates that the physical therapy goals were met

12   and Plaintiff was discharged.  (Tr. 313).

13          On March 15, 2005, Dr. Gibson completed a Medical Assessment of Physical

14   Capacity indicating that Plaintiff could sit one hour, stand or walk 15-30 minutes at a time,

15   sit two hours in an eight hour work day, stand one hour in a workday, walk two hours in a

16   workday, frequently lift up to five pounds, occasionally carry up to five pounds, and

17   occasionally reach over head and extend arms out. (Tr. 334). Dr. Gibson noted that Plaintiff

18   could not use her right arm for pushing and pulling of arm controls or for fine manipulation.

19   (Tr. 334).  Dr. Gibson marked the questions related to Plaintiff's use of feet for frequent or

20   continual repetitive movements as "unknown."  (Tr. 334).  Dr. Gibson further noted that

21   Plaintiff did have pain that would likely additionally limit Plaintiff's activities and designated

22   Plaintiff's pain as "moderately severe"[3] noting that this was based on "patient's report."  (Tr.

23   335).

24          **E.      Richard P. Jocoby, D.P.M.**

25

26

27          [3]Moderately severe is defined as an impairment which seriously affects ability to

28   function.

1      On October 1, 2003, Dr. Richard P. Jocoby, D.P.M. saw Plaintiff at the referral of Dr.

2  Gibson for pain in her left heel.  (Tr. 286).  Dr. Jacoby documented that Plaintiff

3  "[a]pparently...obtained a new pair of shoes and she has had pain in the posterior aspect of

4  the left heel since that time.  She also fe[lt] that she may have traumatized the area in

5  question."  (Tr. 286).  A physical examination revealed point tenderness and plantar left

6  Achilles tendon area at the insertional area. (Tr. 286). X-Rays confirmed Achilles tendinitis

7  and enthesis.  (Tr. 286).  Dr. Jacoby reported that Plaintiff was unable to take oral anti-

8  inflammatories due to GI upset and ulcers.  (Tr. 287).  Dr. Jacoby proceeded instead with

9  orthotics and shoe gear.  (Tr. 287).

10      On October 9, 2003, Dr. Jacoby reported that Plaintiff felt improved and "much better

11  with good supportive shoes" although she experienced pain when wearing dress shoes.  (Tr.

12  285).  Dr. Jacoby injected her with dexamethasone and Xylocaine and instructed Plaintiff to

13  get better shoes for dress shoes.  (Tr. 285).

14      On October 29, 2003, Dr. Jacoby reported that Plaintiff had three weeks of relief from

15  an injection of the left plantar heel, though she had tenderness in the medial calcaneal nerve,

16  and pain of the Achilles tendon area. (Tr. 284).  Dr. Jacoby noted that Plaintiff's left plantar

17  fascitis seemed to be incrementally improved and overall he opined that Plaintiff was doing

18  quite a bit better.  (Tr. 284).  Dr. Jacoby reported that Plaintiff needed good supportive shoes

19  and needed to avoid going barefoot.  (Tr. 284).  He injected her again with dexamethasone

20  and Xylocaine.  (Tr. 284).

21      On December 15, 2003, Dr. Jacoby reported that Plaintiff had multiple varicose veins

22  being treated by Dr. Mishra, left plantar and left posterior Achilles tendon, and right

23  fourth/fifth metatarsal pain.  (Tr. 283).  Dr. Jacoby reported that Plaintiff's plantar heel pain

24  was resolving.  (Tr. 283).  Dr. Jacoby performed another injection and provided Plaintiff with

25  a prescription for orthotics.  (Tr. 283).  He also advised Plaintiff to get her veins attended to

26  by Dr. Mishra before he would consider injecting her Achilles tendon.  (Tr. 283).

27      On January 14, 2004, Dr. Jacoby reported that Plaintiff had varicose veins for which

28  she was referred to Dr. Wareing, and tenosynovitis of the right fifth metatarsal area.  (Tr.

336).   As to the tenosynovitis, Dr. Jacoby noted that Plaintiff had obtained good arch supports and good supportive shoes and that she felt incrementally improved.  (Tr. 336).  Dr. Jacoby manipulated the area and Plaintiff felt better.  (Tr. 336).

At some time, Dr. Jacoby completed a medical source statement of Plaintiff's ability to do work-related activities (physical).  (Tr. 297).  Dr. Jacoby indicated Plaintiff could occasionally or frequently lift less than 10 pounds, stand and/or walk less than two hours in an eight hour workday without the use of an assistive device, sit six hours in an eight hour workday with breaks and lunch providing sufficient relief, occasionally climb, balance, stoop, kneel, crouch, and crawl, with unlimited reaching, handling, fingering, feeling, seeing, hearing, or speaking.  (Tr. 298).

**F.    Unknown Residual Functional Capacity Assessment Form**

On January 14, 2004, a State agency physician (name illegible) completed a physical residual functional capacity (RFC) assessment form.  (Tr. 288).  The physician considered Plaintiff's primary diagnoses as obesity, left knee osteoarthritic changes, right thigh superficial throbophlebitis, and varicose veins.   (Tr. 288).   The physician considered secondary diagnoses of Achilles tendinitis, chronic reflux tendency, and mild gastritis.  (Tr. 288).  The physician opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for at least 2 hours in an 8-hour workday, sit with normal breaks for a total of 6 hours in an 8-hour workday, unlimited pushing and/or pulling, occasional climbing, kneeling, crouching, and crawling, frequent balancing and stooping, no manipulative limitations, no visual limitations, no communicative limitations, and slight environmental limitations related to hazards.  (Tr. 288-293).  The physician noted that the record indicated treatment for mild gastritis and chronic reflux tendency with evidence that these are under control with treatment.  (Tr. 294).  The physician further noted that Plaintiff appeared "to be less than credible" because the degree of symptoms were not consistent with the evidence including Plaintiff's report of activities.  (Tr. 294).  The physician further noted that the medical source statement from podiatrist Dr. Jacoby indicated less than sedentary

1   functional capacity should not be adopted as it was too restrictive for the evidence in the file,

2   including Plaintiff's report of activities and Dr. Jacoby's report of improvement.  (Tr. 295).

3       **G.    Plaintiff's Statements in the Record**

4           **1.    March 11, 2003 Disability Report**

5           Plaintiff filed her application for DIB on March 11, 2003 claiming that she was

6   limited by her right knee problem because she could not sit or stand for long periods of time,

7   could not prop up her knee for long periods of time, and because she had pain all the time.

8   (Tr. 76).  Plaintiff indicated that she worked at times after the date her knee started bothering

9   her and that the knee problem did not cause her to work fewer hours, change her job duties,

10  or make any job-related changes (i.e. attendance, help needed, or employers).  (Tr. 77).

11  Plaintiff stated in her application that she tried to limit the amount of stair climbing she did

12  at work and asked her co-workers to carry her papers due to her knee condition.  (Tr. 77).

13  Plaintiff further stated that the last job she had required stair climbing and she couldn't get

14  from one place to another without having to climb stairs.  (Tr. 82).  Plaintiff indicated that

15  she stopped working to rest her knee and had surgery, but that the surgery made it worse.

16  (Tr. 82).

17          On March 21, 2003, Plaintiff sent a letter to the Social Security Claims representative

18  to provide additional information for consideration.  (Tr. 84).  Plaintiff stated that she had

19  chronic back pain due to disc herniation and moderately severe spinal stenosis, which limited

20  her ability to sit or stand for long.  (Tr. 84).  Plaintiff referenced an MRI done on May 16,

21  1996 at the request of Dr. Shostack, and treatments in 1996 and 1997 by Dr. McLean, Dr.

22  Nenad Jr., and Dr. Chawla.  (Tr. 84).  Plaintiff indicated that she had severe varicose veins

23  in her right leg which limited her time sitting.  (Tr. 84).  Plaintiff further indicated that she

24  had a history of Ulcerative Colitis and Irritable Bowel Syndrome which limited her ability

25  to take anti-inflamatories for her knee and back, and that she had experienced intestinal

26  bleeding from anti-inflamatories in the past.  (Tr. 84).

27          **2.    May 27, 2003 Activities of Daily Living Questionnaire**

28

On May 27, 2003, Plaintiff completed an Activities of Daily Living Questionnaire. (Tr. 103). Plaintiff's average day included preparing meals, doing knee and back exercises, doing laundry with assistance from her husband, grocery shopping once a week, and sitting for one hour at the computer or doing crafts. (Tr. 103). Plaintiff could not cut her own toenails or take care of her feet and could not take baths because of her back and knee problems (could only shower). (Tr. 103). Plaintiff needed help with cleaning but could do the dusting by herself if wearing a back brace, but had to stop frequently. (Tr. 104). Plaintiff was able to shop for groceries if she could lean on the basket and had her husband carry the groceries inside. (Tr. 104). Plaintiff could not hike or do much walking, but could sit for an hour while doing her crafts, quilting, or riding in a car. (Tr. 105). Plaintiff could not kneel in church. (Tr. 105). Plaintiff indicated that she had not tried to work since her disability began. (Tr. 105)

### 3.   November 13, 2003, Reconsideration Disability Report

On November 13, 2003, Plaintiff completed a Reconsideration Disability Report indicating that she was "worse" than before, was in "more pain, more often," and affected by cold/damp conditions. (Tr. 108). Plaintiff noted that she could not sit, stand, or walk very far, needed to lay down periodically to relieve her pain, and often slept poorly and was tired the next day. (Tr. 108). Plaintiff indicated that there was "nothing new lately" to report regarding any restrictions being placed on her by a physician, stating that it has been the "same for [the] past few years." (Tr. 108). Plaintiff indicated that as to her daily activities, she was "doing less than before" but provided no elaboration. (Tr. 110).

### 4.   December 8, 2003, Activities of Daily Living Questionnaire

On December 8, 2003, Plaintiff reported that her average day included preparing meals, back and knee exercises, and resting off an on throughout the day. (Tr. 115). Plaintiff needed help from her husband on many activities, hobbies/crafts if done were limited to 1 hour of sitting at a time, and Plaintiff wore a back brace if doing any unusual activity. (Tr. 115). Plaintiff still had problems with foot care and was still unable to take baths. (Tr. 115). If Plaintiff cooked meals she needed help with cleanup. (Tr. 115). Plaintiff could do laundry

1   if her husband carried the laundry basket, could not do yard work, and wore a back brace and

2   stopped frequently when dusting.  (Tr. 116).  Plaintiff went grocery shopping weekly if she

3   could use the shopping cart to lean on and her husband carried the groceries.  (Tr. 116).

4   Plaintiff could not shop in the mall and was limited to one hour and one store.  (Tr. 116).

5   Plaintiff was no longer able to hike or do much walking for recreation and riding in a car for

6   more than one hour was a problem.  (Tr. 117).  Plaintiff indicated that her activities had

7   changed and that she needed more help with activities and errands and could not drive if

8   taking Tylenol 3.  (Tr. 117).  Plaintiff had not tried to work since her disability began.  (Tr.

9   117).

10              **5.      Claimant's Statement When Request for Hearing Is Filed**

11          Plaintiff submitted a Statement that described Plaintiff's conditions.  (Tr. 119).

12   Plaintiff reported that Arthritis in her neck prevented her from looking down for very long,

13   her hands would go numb, and it was difficult to sit and lookdown and address Christmas

14   cards in December 2003.  (Tr. 119).

15                    **6.      May 27, 2003, Work History Report**

16          On May 27, 2003, Plaintiff completed a Work History Report indicating that she had

17   been a certified legal assistant from 1984-1993, and an applications specialist in the

18   administrative office of a hotel chain from 1993-2001.  (Tr. 95).  Plaintiff reported that in her

19   most recent job as an applications specialist required her to walk 8 hours a day, stand 1 hour

20   a day, sit 8 hours a day, climb 1 hour a day, stoop 2 hours a day, crouch 2 hours a day, reach

21   1 hour a day, and write, type, or handle small objects 8 hours a day.  (Tr. 96).  Plaintiff

22   reported that she lifted no more than 10 pounds, lifting and carrying files a daily basis and

23   loading and unloading tubs of files in the board room.  (Tr. 96).

24          Plaintiff reported that her earlier work as a certified legal assistant required her to

25   walk 1 hour a day, stand 1 hour a day, sit 8 hours a day, climb less than 1 hour a day, stoop

26   1 hour a day, crouch 1 hour a day, reach 1 hour a day, and write, type, or handle small objects

27   8 hours a day.  (Tr. 97).  Plaintiff reported that she lifted no more than 10 pounds, lifting and

28   carrying files, manuals, and boxes on a daily basis.  (Tr. 97).

**H.    Testimonial Evidence**

Plaintiff appeared before Administrative Law Judge ("ALJ") Ronald C. Dickinson on March 23, 2005, represented by attorney Patricia J. Stewart. (Tr. 407).

**1.    Plaintiff's Testimony**

On the date of the hearing, Plaintiff was 61 years old, 5'2" tall, and weighed 220 pounds. (Tr. 412). Plaintiff was not earning any money but had a 401(k). (Tr. 414). Her husband was retired. (Tr. 414). Plaintiff's most recent work was as an application specialist at Best Western, where she was seated for six hours a day, although it could vary. (Tr. 415). Plaintiff believed that she had to lift 10 pounds or more. (Tr. 415). Plaintiff testified that the job was very hard on her physically because there were stairs in the office and traversing the stairs was damaging her knee. (Tr. 417).

Plaintiff originally injured her right knee at work in 1994, when she slipped in the parking lot. (Tr. 417). She went to the workman's compensation doctor who told her that nothing was wrong. (Tr. 417). A year after that fall, Plaintiff found that going up the stairs and down the stairs every day took a toll and she started having problems going up the stairs. (Tr. 418). The problems going up the stairs went away and then Plaintiff's knee started to get bothered going down the stairs. (Tr. 418). Plaintiff's knee problems got progressively worse. (Tr. 418). In 2001, Plaintiff fell again when she tripped on some uneven pavement in the parking lot. (Tr. 419). Plaintiff returned to the workman's compensation doctor and received benefits. (Tr. 419). Plaintiff had knee surgery in February 2002 and her knee got worse after that. (Tr. 419).

Plaintiff could not recall the date she first injured her left knee, but thought it may have been April 2003, or the fall of some year. (Tr. 420). When her husband was having surgery there was wet carpet or flooring at the hospital and Plaintiff slipped and fell. (Tr. 420). After this fall Plaintiff's dog ran into her left knee sideways. (Tr. 420). Plaintiff tripped over some shoes in her bedroom and fell towards the closet. (Tr. 420). Sometime later Plaintiff tripped on some uneven sidewalk. (Tr. 420). Plaintiff testified that immediately she could not walk. (Tr. 420). Plaintiff's right knee was usually worse than the

1    left but it varied. (Tr. 421). On the date of the hearing, Plaintiff reported pain, swelling, and

2    stiffness in her knees. (Tr. 421).

3        Plaintiff had back problems that became acute in 1996 and 1997, though the problems

4    existed prior to that. (Tr. 419). Sitting and walking on the stairs began getting very difficult.

5    (Tr. 419). Plaintiff was allowed to cut back her work hours because of that. (Tr. 419). The

6    back problems consisted of a herniated disc and spinal stenosis in Plaintiff's lower back. (Tr.

7    421).

8        Plaintiff also had arthritis in her neck or a pinched nerve, which she went to physical

9    therapy for. (Tr. 422). She had arthritis in her right hand, a bone spur on her left foot, and

10    a heel spur. (Tr. 422). Plaintiff had varicose veins and phlebitis in the right leg. (Tr. 423).

11        Plaintiff testified that she could only stand for five minutes before her back gets tired

12    and achy and her knees start to bother her and she has to sit down. (Tr. 423). She could only

13    sit for one hour at a time before her back hurts. (Tr. 424). Plaintiff thought she could lift a

14    gallon of milk from the counter but not from the floor because she couldn't bend her knees

15    to squat down. (Tr. 424). Plaintiff would also have difficulty with a gallon of milk because

16    her right hand had arthritis. (Tr. 424-425).

17        Plaintiff could only dust. (Tr. 425). Her husband did the rest of the housework. (Tr.

18    425). Plaintiff could drive a car if she needed to go to the shopping or to the doctor. (Tr.

19    425). When grocery shopping Plaintiff could lean on the cart. (Tr. 425).

20        Plaintiff did not believe she could do the work she was doing even if there weren't

21    stairs involved because of her back and knees. (Tr. 426). Plaintiff would not be able to sit,

22    but would have to get up and move around. (Tr. 426). Plaintiff acknowledged having

23    worked through the pain for several years and eventually stopped working because her pain

24    wasn't getting better. (Tr. 426).

25        Plaintiff's counsel asked if Plaintiff thought she would be able to work if she could

26    "sit for a while and then...get up, walk around, leave your job site, walk around for a few

27    minutes, and then come back whenever you want to." (Tr. 428). Plaintiff stated that her pain

28    got worse at the end of the day and she probably would not be able to keep working because

1   it would build up.  (Tr. 428-429).  In 1999, Plaintiff stopped working at Best Western
2   because she wanted to take care of her knee.  (Tr. 429).  Her employer asked her to come
3   back because her replacement didn't work out. (Tr. 429). Plaintiff returned to work full-time
4   for a few months and then went part-time.  (Tr. 429-430).  To relieve her pain, Plaintiff did
5   exercises, laid down, used traction on her neck, heat on her back four times a week, and ice
6   on her knee once a week.  (Tr. 430-431).

7        Plaintiff had not had surgery on her varicose veins.  (Tr. 432).  The doctors
8   recommended that she go to a vein specialist.  (Tr. 432).  To relieve her pain related to the
9   varicose veins, Plaintiff propped her knee up while sitting and watching TV.  (Tr. 432).

10       Plaintiff had an MRI in 1996 on her back.  (Tr. 433).  Doctors discussed surgery with
11  Plaintiff originally and also gave her the option of epidural blocks. (Tr. 433).  Plaintiff chose
12  the epidural blocks, which she said helped her.  (Tr. 433).  She had epidural blocks a year
13  later. (Tr. 433).  Plaintiff described different sensations in her back, from pain that went all
14  the way across to a pinching pain.  (Tr. 434).  Plaintiff testified that when she got sciatica
15  she couldn't get out of bed and couldn't do anything.  (Tr. 434).  When that happened she
16  would just try to take it easy.  (Tr. 434).  Plaintiff was dealing with her symptoms by
17  controlling her activities.  (Tr. 435).

18       Plaintiff started having arthritic symptoms in her right hand in October of 2004.  (Tr.
19  435).  Plaintiff also had pain in her neck when sitting and looking down at a desk or table or
20  sideways.  (Tr. 435).  Plaintiff would have spasms in her neck and right shoulder.  (Tr. 436).
21  Plaintiff had trouble going to sleep because of the pain, but once she fell asleep she was
22  usually okay.  (Tr. 437).

23              **2.    Vocational Expert's Testimony**

24       The Vocational Expert ("VE") summarized Plaintiff's relevant work history.  (Tr.
25  441).  The Dictionary of Occupational Titles ("DOT") defined the job of application
26  specialist as sedentary, semiskilled, with an SVP of 4.  (Tr. 441).  As described by Plaintiff,
27  the job would be light and semiskilled.  (Tr. 441).  The job of legal assistant is sedentary,
28  skilled, with an SVP of 7.  (Tr. 441).

1    The VE testified that the nature of semiskilled and skilled work allows a person to get

2    up and move around from one position to another throughout the day. (Tr. 442). If a person

3    was sitting and needed to stand up because of knee pain to move around a little they would

4    be allowed to and could still perform their job duties. (Tr. 442). Although a person would

5    be able to get up and move around periodically, it would not necessarily be at will, and there

6    may be tasks that require prolonged periods of sitting. (Tr. 444).

7    The VE testified that with an unskilled job, missing one day per month is all that is

8    tolerated. (Tr. 442). With higher skilled jobs it tends to be a little bit higher, typically two

9    to three days per month, but no more. (Tr. 442). The VE admitted that unplanned absences

10   would be less tolerated – i.e. just getting up in the morning and calling in sick – as opposed

11   to planned absences. (Tr. 442-447). Repeated unplanned absences would lead to dismissal

12   from a job. (Tr. 447).

13   **I.    The ALJ's Findings**

14   On May 23, 2005, the ALJ issued a written opinion denying Plaintiff's application for

15   DIB benefits. (Tr. 21-30). The ALJ discussed Plaintiff's medical history, noting that even

16   during the time that Plaintiff was undergoing conservative treatment for her right knee, her

17   treating physician indicated that she was able to perform light duty work or full duty work.

18   (Tr. 28). It was only for a short period of time after her right knee surgery that her treating

19   physician indicated she was on non-work status and soon after she was able to do light duty

20   seated work. (Tr. 28). As to Plaintiff's left knee, the ALJ noted that Dr. Freedberg reported

21   improvement after injections and physical therapy. (Tr. 28). The ALJ gave little weight to

22   the Medical Source Statement completed by Dr. Jacoby, which indicated that Plaintiff was

23   limited to less than sedentary work, because the ALJ found that such extreme limitations

24   were not supported by his treatment records, which showed improvement within a short

25   period of time with treatment. Nor did the ALJ find Dr. Jacoby's opinion supported by the

26   remainder of the objective evidence. (Tr. 28).

27   As for Plaintiff's right trapezius/cervical strain with right upper extremity

28   radiculopathy, the ALJ noted that the condition improved with physical therapy and there

was no evidence that it caused limitations in Plaintiff's ability to function for 12 consecutive months.  (Tr. 28).  The ALJ gave little weight to Dr. Gibson's Medical Assessment of Physical Capacity because such extreme limitations and level of pain were not supported by either her treatment records or by the remainder of the objective medical evidence in the file. (Tr. 28).  The ALJ noted that Dr. McPhee's examination established that despite chronic low back pain, varicose veins of the right lower extremity, bilateral knee pain, and obesity, Plaintiff would be able to do sedentary work, with a brief change in position periodically. (Tr. 28).

The ALJ also rejected Plaintiff's allegations regarding the degree of her impairments as not credible.  (Tr. 28).  Specifically, the ALJ found that the testimony of Plaintiff was not fully credible concerning the severity of her symptoms and the extent of her limitations. Neither the severity nor th extent was supported by the objective medical evidence of record. (Tr. 28).  Second, the ALJ found that with regard to daily activities, Plaintiff reported on May 27, 2003, that she prepared meals, did laundry and dusting, and shopped for groceries.  (Tr. 28).  Plaintiff also did knee and back exercises, was able to drive, and was usually able to run errands by herself.  (Tr. 28).  The ALJ noted that although Plaintiff reported that her activities were more limited than in the past, they were not the activities of an individual too disabled to perform sedentary work.  (Tr. 29).

The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work. (Tr. 29).  Plaintiff could sit for six hours in an eight-hour workday, stand and/or walk for two hours in an eight-hour workday, and lift and/or carry five pounds frequently and ten pounds occasionally.  (Tr. 29).  Plaintiff needed to be able to stand periodically and move around.  (Tr. 29).  Plaintiff could not crawl, crouch, climb, squat, or kneel, and could not use her lower extremities for pushing or pulling.  (Tr. 29).  The ALJ determined that Plaintiff had the residual functional capacity to perform work as an applications specialist and as a legal assistant because those jobs did not require the performance of work-related activities precluded by her residual functional capacity.  (Tr. 30).  Thus, the ALJ concluded that

1  Plaintiff was not under a "disability" as defined in the Social Security Act at any time

2  through the date of the opinion.

3  **III.    Standard of Review**

4        The Court reviews the Commissioner's final decision under a substantial evidence

5  standard; the decision will be disturbed only if it is not supported by substantial evidence or

6  based on legal error.  See 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

7  Security as to any fact, if supported by substantial evidence, shall be conclusive....").

8  "Substantial evidence" means "more than a scintilla," but "less than a preponderance."

9  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal citations omitted).   In

10 determining whether the Commissioner's finding are supported by substantial evidence, the

11 Court considers the evidence as a whole, giving a full review to all the facts.  Smolen, 80

12 F.3d at 1279.

13 **IV.    Discussion**

14       The Social Security Act defines a disability as the "inability to engage in any

15 substantial gainful activity by reason of any medically determinable physical or mental

16 impairment which . . . has lasted or can be expected to last for a continuous period of not less

17 than 12 months." 42 U.S.C. § 423(d)(1)(A).  The ALJ engages in the following five-step

18 evaluation:

19      In step one, the ALJ determines whether a claimant is currently engaged in substantial
     gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step
20      two and evaluates whether the claimant has a medically severe impairment or
     combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ
21      proceeds to step three and considers whether the impairment or combination of
     impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P,
22      App. 1.  If so, the claimant is automatically presumed disabled. If not, the ALJ
     proceeds to step four and assesses whether the claimant is capable of performing her
23      past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to
     step five and examines whether the claimant has the residual functional capacity
24      ("RFC") to perform any other substantial gainful activity in the national economy.
     If so, the claimant is not disabled.  If not, the claimant is disabled.

25 Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005); 20 C.F.R. § 404.1520. Here, the ALJ found

26 that Plaintiff satisfied steps one and two.  Plaintiff "has not engaged in substantial gainful

27 activity since the amended alleged onset date of disability" and has "severe" impairments

28

1    within the meaning of the Act and Regulations. (Tr. 30).  In step four, the ALJ determined

2    that Plaintiff was capable of performing her past relevant work, and on that basis, found that

3    Plaintiff was not disabled.  (Tr. 30).

4            **A.    Plaintiff's Credibility**

5            Plaintiff contends that the ALJ's credibility assessment of Plaintiff's testimony

6    concerning the severity of her symptoms  was not supported by specific findings or clear and

7    convincing reasons.  (Plaintiff's Motion for Summary Judgment (Dkt. 26-2, at 3).  "While

8    an ALJ may find testimony not credible in part or in whole, he or she may not disregard it

9    solely because it is not substantiated affirmatively by objective medical evidence." Robbins

10   v. SSA, 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-7p, 1996 WL 374186, at *1).

11   Where an ALJ does not make a finding of malingering, as is the case here, the ALJ "may

12   only find an applicant not credible by making specific findings as to credibility and stating

13   clear and convincing reasons for each." Robbins, 466 F.3d at 883 (citing Smolen v. Chater,

14   80 F.3d 1273, 1283-84 (9th Cir. 1996)).

15           Here, the ALJ did not discuss in narrative fashion the evidence he considered in

16   the analysis of Plaintiff's credibility.  The ALJ stated that he was rejecting Plaintiff's

17   "allegations of the degree of her impairments and limitations...for the following reasons:

18   First, the testimony of the claimant is not fully credible concerning the severity of her

19   symptoms and the extent of her limitations.  Neither the severity nor the extent is

20   supported by the objective medical evidence of record."  (Tr. 28).  General findings of

21   this nature are insufficient when making a credibility assessment.  See Lester v. Chater,

22   81 F.3d 821, 834 (9th Cir. 1995) ("For the ALJ to reject the claimant's complaints, she

23   must provide "'specific, cogent reasons for the disbelief.'").  "[T]he ALJ must identify

24   what testimony is not credible and what evidence undermines the claimant's complaints."

25

26

27

28

1   <u>Lester</u>, 81 F.3d at 834.  The ALJ did not identify the specific testimony or specific

2   evidence that undermines Plaintiff's claims.[4]

3

4   _____

5       [4]It is not the job of this Court to determine credibility, but the record contains several
    examples of inconsistencies between Plaintiff's testimony and the objective findings.  For
6   example, as to Plaintiff's right knee, Plaintiff testified that her right knee problems began in
    1994, got progressively worse, and that even after her knee surgery in February 2002 her
7   knee was worse than before." (Tr. 417-419).  After seeing Dr. Greenfield on April 9, 2001,
    Plaintiff began physical therapy for her right knee. (Tr. 201). Plaintiff reported on April 30,
8   2001 and May 21, 2001, that her right knee symptoms were improving with physical therapy.
    (Tr. 198, 197).  On June 18, 2001, and August 13, 2001, Plaintiff reported that her knee
9   didn't bother her every day, but she still got some discomfort and swelling." (Tr. 196, 195).
    On November 15, 2001, Plaintiff reported that she felt improved over time, though she had
10  a level of discomfort in her right knee that didn't bother her with certain activities. (Tr. 192).
    At that point, Dr. Greenfield discussed either declaring Plaintiff "stationary" – i.e. not
11  improving or getting worse – or trying further treatment. (Tr. 192).  From April 2001 to
    November 2001, Dr. Greenfield's reports demonstrated that Plaintiff had improved, though
12  her improvement had reached a plateau.  Dr. Greenfield had placed Plaintiff on full work
13  status throughout this time.

14      When told on November 15, 2001, that she was no longer improving nor getting
    worse, Plaintiff requested arthroscopic surgery. (Tr. 192).  Following Plaintiff's surgery on
15  February 15, 2002, Plaintiff was immediately in worse pain, though by July 1, 2002, Dr.
    Greenfield reported that Plaintiff felt improvement, did not have any discomfort medially,
16  but had started to notice some discomfort laterally.  (Tr. 185).  Dr. Greenfield declared
17  Plaintiff stationary as to her knee injury, but noted that for further treatment regarding some
    preexisting degenerative arthritis, Plaintiff could be evaluated under her private health
18  insurance. (Tr. 185).  Dr. Greenfield assessed Plaintiff at a permanent impairment rating of
    10%. (Tr. 185).  On November 14, 2002, Dr. Greenfield reported that Plaintiff had been
19  walking, and her ease of walking had improved, although she had noticed some discomfort
20  in her right hip area and right foot.  Dr. Greenfield placed Plaintiff on full work status. (Tr.
    184).
21
        While Plaintiff is correct that Dr. Greenfield treated only Plaintiff's right knee, his
22  assessments and medical records show that Plaintiff improved with physical therapy, and
23  though she was not able to work immediately after her surgery, by July 1, 2002, she had no
    discomfort medially, was declared stationary as to her knee injury, and was assessed at 10%
24  permanent impairment rating for her lower extremity.  (Tr. 185).  This evidence is not
    consistent with Plaintiff's testimony that her knee got progressively worse up until and after
25  her surgery. (Tr. 417-419).  Indeed, Plaintiff's knee improved with physical therapy from
26  April 2001 until June 2001. (Tr. 196-199).  After recovering from her surgery in July 2002,
    Dr. Greenfield reported that Plaintiff's right knee injury was stationary and neither getting
27  better nor worse. (Tr. 185).

28

1      The ALJ also noted that "with regard to daily activities, the claimant reported on

2  May 27, 2003, that she prepared meals, did clothes washing and dusting, and shopped for

3  groceries.  She was able to drive and was usually able to run errands by herself.  She and

4  her husband both managed the bills and other business matters."  (Tr. 28-29).  The ALJ

5  then stated that "[a]lthough, by her report, her activities are more limited than they were

6  in the past, they are not the activities of an individual too disabled to perform sedentary

7  work."  (Tr. 29).  This general discussion also lacks specific findings supported by clear

8  and convincing evidence.  Indeed, the ALJ omitted key portions of the record, which

9  explained how Plaintiff was able to perform these daily activities in light of her physical

10  limitations – i.e. with help from her husband or by leaning on a shopping cart while

11  shopping for groceries.  (See PMSJ at 2-9).  The Court cannot sustain such a finding.  See

12  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982) ("[Q]uestions of credibility and

13  resolution of conflicts in the testimony are functions solely of the Secretary.").

14      Because the ALJ made only general findings that Plaintiff was not credible as to

15  her claimed severity of symptoms and extent of limitations, the Court is unable to assess

16  whether such findings were legitimate.  See Robbins, 466 F.3d at 884-85 ("[E]ven if the

17  ALJ had given facially legitimate reasons for his partial adverse credibility finding, the

18  complete lack of meaningful explanation gives this court nothing with which to assess its

19  legitimacy.").

20          **B.     Plaintiff's Residual Functional Capacity**

21      Plaintiff further contends that the ALJ's determination of Plaintiff's residual

22  functional capacity was based on the restrictions outlined by Dr. McPhee, who examined

23  Plaintiff only once in September 2003.  (Dkt. 26-2, at 9).  Plaintiff contends that the

24  March 15, 2005, evaluation of Plaintiff's treating physician, Dr. Gibson, was wrongfully

25  dismissed.  The ALJ's opinion stated that he had considered the Medical Assessment of

26  Physical Capacity completed by Dr. Gibson.  He, however, decided to give her opinion

27  "little weight because such extreme limitations and level of pain [were] not supported by

28

1   either her treatment records or by the remainder of the objective medical evidence in the

2   file." (Tr. 28).

3          "By rule, the Social Security Administration favors the opinion of a treating

4   physician over non-treating physicians." See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir.

5   2007) (citing C.F.R. § 404.1527).  The Administration has explained that an ALJ's

6   finding that a treating source medical opinion is not well-supported by medically

7   acceptable evidence or is inconsistent with substantial evidence in the record means only

8   that the opinion is not entitled to controlling weight, not that the opinion should be

9   rejected.  See Orn, 495 F.3d at 632 (citing § 404.1527).  Treating source medical opinions

10  are still entitled to deference and, in many cases, will be entitled to the greatest weight

11  and should be adopted, even if it does not meet the test for controlling weight." Orn, 495

12  F.3d at 632; see also Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983) ("If the ALJ

13  wishes to disregard the opinion of the treating physician, he or she must make findings

14  setting forth specific, legitimate reasons for doing so that are based on substantial

15  evidence in the record.").

16         The record reflects that Dr. Gibson had been treating Plaintiff since April 2001 and

17  had detailed notes regarding Plaintiff's conditions.  Specifically, Dr. Gibson documented

18  Plaintiff's left knee injury, ordered X-Rays and an MRI, and eventually referred Plaintiff

19  to Dr. Freedberg, who diagnosed a possible lateral meniscal tear. (Tr. 255, 220, 221).  In

20  September 2003, Dr. Gibson noted Plaintiff's superficial thrombophlebitis of the right

21  thigh.  (Tr. 227).  Dr. Gibson also referred Plaintiff to Dr. Jacoby for the pain in

22  Plaintiff's left heel. (Tr. 286).  X-Rays confirmed Achilles tendinitis. (Tr. 286).  From

23  April 2004 to November 2004, Dr. Gibson reported right hip/buttock pain, cervical

24  muscle strain, right hand pain, and a right trapezius strain with right upper extremity

25  radiculopathy. (Tr. 301-305).  Dr. Gibson's March 15, 2005, Assessment indicated that

26  Plaintiff could sit one hour, stand or walk 15-30 minutes at a time, sit two hours in an

27  eight hour workday, stand one hour in an eight hour workday, walk two hours in a

28  workday, frequently lift up to five pounds, occasionally carry up to five pounds, and

1    occasionally reach over head and extend arms out.  (Tr. 334).  Dr. Gibson noted that

2    Plaintiff reported pain which was moderately severe that would likely limit her activities.

3    (Tr. 335).

4            The law in the Ninth Circuit is clear that the ALJ must defer to the treating

5    doctor's opinion, even if controverted by another doctor, unless the ALJ makes findings

6    setting forth specific legitimate reasons for rejecting it that are based on substantial

7    evidence in the record.  See Lester, 81 F.3d at 830-31.  Here, the ALJ did not state that

8    Dr. Gibson's opinion was *contradicted* only that the limitations assessed by Dr. Gibson

9    were not supported by her records or the remainder of the record.  Under these

10   circumstances, Dr. Gibson's opinion was entitled to deference.  Furthermore, the ALJ did

11   not set forth specific legitimate reasons for rejecting the opinion of Dr. Gibson supported

12   by substantial evidence in the record.  To the contrary, the ALJ's reasoning was cursory

13   and the record contains substantial evidence supporting Dr. Gibson's assessment.

14           **C.    Dr. Greenfield's Opinion**

15           It is important to note that Dr. Gibson's assessment was completed in March 2005,

16   nearly four years after Plaintiff's alleged disability onset date of June 1, 2001.  From

17   April 9, 2001, to February 15, 2002, Dr. Greenfield, another of Plaintiff's treating

18   physicians continually placed Plaintiff on full work duty.  Plaintiff contends that Dr.

19   Greenfield only treated Plaintiff's knee injury and that, even when he discharged her in

20   July 2002, he acknowledged that Plaintiff could seek other treatment for her preexisting

21   degenerative arthritis.  (Tr. 185).  Nonetheless, the Court finds no contemporaneous

22   medical evidence in the record that contradicts Dr. Greenfield's continued opinion that

23   Plaintiff could work full duty from April 2001 to February 2002, and then after

24   November 2002.  (Tr. 184).  As a treating physician, Dr. Greenfield's uncontroverted

25   opinion is entitled to controlling weight.  See  Orn, 495 F.3d at 631.  On remand,

26   Plaintiff's residual functional capacity during her period of treatment with Dr. Greenfield

27   should be determined because it may be that during that time Plaintiff's limitations were

28   not as severe as in 2005, when Dr. Gibson completed the assessment of physical capacity.

1    **V.       Conclusion**

2           The Court has reviewed the Commissioner's final decision under a substantial

3    evidence standard and finds that the decision denying benefits is not supported by

4    substantial evidence.  Specifically, the ALJ made an unsupported credibility

5    determination and gave too little weight to the opinion of Plaintiff's treating physician,

6    Dr. Gibson.  The case will be remanded for further administrative proceedings.  On

7    remand, the ALJ will make a new credibility determination that meets the requirements of

8    this Circuit and will give deference to the March 15, 2005, assessment of Dr. Gibson.

9    The ALJ will also separately assess Plaintiff's residual functional capacity during the time

10   period Plaintiff was being treated by Dr. Greenfield.  In the event Plaintiff is determined

11   to be under a disability, the ALJ may have to change the onset date.  Finally, the ALJ

12   should retain a vocational expert to provide testimony regarding Plaintiff's past relevant

13   work, and if necessary, any work that Plaintiff could do in the national economy.  The

14   vocational expert should answer a hypothetical based on Plaintiff's determined residual

15   functional capacity, describe the nature of all past relevant work, and consider whether

16   the relevant work could be done by a person with Plaintiff's determined residual

17   functional capacity.

18          Accordingly,

19          **IT IS ORDERED** granting Plaintiff's Motion for Summary Judgment (Dkt. 26)

20   and denying Defendant's Cross-Motion for Summary Judgment (Dkt. 32).

21          **IT IS FURTHER ORDERED** reversing the decision of the Commissioner

22   denying benefits and remanding for further Administrative proceedings consistent with

23   this Order.

24          DATED this 26th day of January, 2008.

25

26                                        _____

27                                        Earl H. Carroll
                                          United States District Judge

28